**SERVICE EMPLOYEES INT'L UNION HEALTH AND WELFARE FUND, et al., Plaintiffs,**

v.

**PHILIP MORRIS INC., et al., Defendants.**

**S.E.I.U. Local 74 Welfare Fund, et al., Plaintiffs,**

v.

**Philip Morris Inc., et al., Defendants.**

**Michael H. Holland, Trustee of the United Mine Workers of America Combined Benefit Fund, et al., Plaintiffs,**

v.

**Philip Morris Inc., et al., Defendants.**

**Nos. CIV.A 98–704 GK, CIV.A. 98–1569 GK and CIV.A. 98–1716 GK.**

United States District Court, District of Columbia.

Dec. 21, 1999.

72

Jonathan Watson Cuneo, the Cuneo Law Group, P.C., Washington, DC, Michael C. Spencer, Milberg, Weiss, Bershard, Hynes & Lerach, LLP, New York, NY, for Plaintiffs.

David Stewart Eggert, Arnold & Porter, Washington, DC, for Defendant Philip Morris, Inc.

Paul Sommer Ryerson, Jones, Day, Reavis & Pogue, Washington, DC, for RJR Nabisco, Inc.

Kenneth N. Bass, Kirkland & Ellis, Washington, DC, for Defendant Brown & Williamson Tobacco Corp.,

Kenneth N. Bass, Kirkland & Ellis, Washington, DC, Robert John Cynkar, Cooper, Carvin & Rosenthal, P.L.L.C., Washington, DC, for Defendant B.A.T. Industries, P.L.C.

Michael Broughton MacWilliams, Goodell, Devries, Leech & Gray, L.L.P, Baltimore, MD, for Defendant Lorillard Tobacco Company.

## MEMORANDUM OPINION

KESSLER, District Judge.

Plaintiffs, numerous labor union health and welfare trust funds,[1] have brought suit

---

1. The above-captioned cases were consolidated for pre-trial purposes, without objection,

against the Defendant tobacco companies and two of their ancillary organizations to recoup economic damages they allege are the result of Defendants' conduct. Plaintiffs claim these damages were caused by what they allege to be the deceptive, fraudulent, and wrongful manner in which the Defendant companies targeted the marketing of their tobacco products to children, deceived the American public about the addictive and harmful nature of nicotine, suppressed and concealed industry-sponsored research, manipulated nicotine levels in their tobacco products so as to make them more addictive, and successfully discouraged development and manufacture of less addictive tobacco products.

The matter is now before the Court on the motions to dismiss filed by seven of the eight tobacco companies,[2] the Council for Tobacco Research—U.S.A., Inc., and the Tobacco Institute, Inc. No other pleadings have been filed nor any discovery undertaken. It should be noted at the outset that motions to dismiss for failure to state a claim upon which relief can be granted are generally viewed with disfavor and rarely granted. *Doe v. U.S. Dep't of Justice,* 753 F.2d 1092, 1102 (D.C.Cir.1985) (citing 2A James Wm. Moore et al., *Moore's Federal Practice* § 12.08 (2d ed. 1948 & Supp.1984)).

The law is clear that at this early stage, "a complaint should not be dismissed for failure to state a claim unless it appears *beyond doubt* that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (emphasis added); *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 119 S.Ct. 1661, 1676, 143 L.Ed.2d 839 (1999). Moreover, the law is equally clear that "we must accept as true all of the material allegations in the plaintiffs' complaint... Defendants' factual allegations, if in agreement with plaintiffs', only reinforce plaintiffs' case; if in disagreement, they must be ignored. Thus, at this stage of the proceedings, the only relevant factual allegations are the plaintiffs'." *Ramirez de Arellano v. Weinberger,* 745 F.2d 1500, 1506 (D.C.Cir.1984), *vacated on other grounds,* 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985); *Shear v. National Rifle Ass'n of Am.,* 606 F.2d 1251, 1253 (D.C.Cir.1979). Despite the sweeping breadth and seriousness of Plaintiffs' assertions, their validity is not for this Court to judge at this time.

Upon consideration of the motions, oppositions, replies, the applicable case law, the arguments presented at the oral hearing, and the entire record herein, for the reasons discussed below, Defendants' motions to dismiss for failure to state a claim [98–704: # 9; 98–1569: # 5; 98–1716: # 10] are denied as to the RICO claims, granted as to the fraud claim although Plaintiffs will be given an opportunity to correct the deficiency in their pleadings, and granted as to all other claims. Defendants' motions to dismiss for failure to join necessary parties [98–704: # 10; 98–1716: # 11] are denied. Defendants' Motion to Dismiss for Insufficiency of Service of Process [98–1569: # 7] is denied.

## I. Plaintiffs' Factual Allegations

The Plaintiffs (or "Funds") are non-profit, multi-employer, labor union health and welfare trust funds, and trustees of the United Mine Workers of America Combined Benefit Fund. They were created by their respective parent labor unions to provide health insurance coverage to union members and their families ("partici-

---

by the Court's Order of June 10, 1999.

**2.** Defendant B.A.T. Industries, Inc. has not joined the motions to dismiss, pursuant to an agreement between the Plaintiffs and Defendants. B.A.T. Industries, which wishes to raise questions of personal jurisdiction, has been given thirty days after the disposition of

these motions to file a responsive pleading to the Amended Complaint. Stipulated Order of July 9, 1999. Additionally, though Defendant Liggett & Myers, Inc. did not join the motions to dismiss, it has adopted the reasoning in these motions.

pants"). Contributions to the Funds are made by employers pursuant to collective bargaining agreements. *See, e.g.,* Compl.[3] at ¶¶ 12–21.

The Funds are governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461. Some of the Funds self-insure (i.e., pay for medical expenses directly out of their own coffers), while others contract with third-party health insurance companies (e.g., Blue Cross Blue Shield) to provide health insurance coverage to their participants. Some Funds have self-insured in the past but now contract with third-party insurance companies, and vice versa.

Defendants are eight major United States and British tobacco manufacturers, as well as the Council for Tobacco Research and the Tobacco Institute, two organizations created and funded by the tobacco companies. Compl. at ¶¶ 22–33.

Plaintiffs have filed a 151–page complaint describing in considerable detail what is alleged to be a four-decade long conspiracy, dating from at least 1953, to intentionally and willfully deceive and mislead the American public as well as the Funds and their participants about the medically harmful nature of tobacco products, the addictive nature of nicotine, and the possibility of manufacturing and marketing safer and less addictive tobacco products. Compl. at ¶ 3, 4.

A summary of Plaintiffs' allegations is necessary to fully convey the scope of their claims as well as the nature of the injuries they claim to have suffered.

Plaintiffs commence their complaint with an outline of what they allege to be the "staggering loss of life, premature disability, disease, illness and economic loss, attributable in part to the increased medical costs attributable to cigarettes and smokeless tobacco." Compl. at ¶ 7. In addition to causing more than 85% of all lung can-

cer, smoking is responsible for at least 30% of all deaths from cancer. Smoking is also the cause of more than 80% of deaths from pulmonary diseases such as emphysema and bronchitis, and is responsible for thousands of deaths annually from cardiovascular disease, including stroke, heart attack, peripheral vascular disease, and aortic aneurysm. According to the Federal Centers for Disease Control and Prevention, each year cigarette smoking kills more than 400,000 Americans, exceeding the combined deaths caused by automobile accidents, AIDS, alcohol use, use of illegal drugs, homicide, suicide, and fires. This figure of 400,000 deaths per year exceeds the total number of American lives lost in all the wars this country has fought in this century. Compl. at ¶¶ 7, 38–41.

Nicotine has been recognized as an addictive drug by the Food and Drug Administration ("FDA"), the U.S. Surgeon General, the World Health Organization, the American Medical Association, and other major medical organizations. They all acknowledge that tobacco use is a form of drug dependence that causes severe adverse health consequences and increased medical costs. Compl. at ¶ 43.

Plaintiffs allege that until January of 1998, the tobacco industry denied the addictive and lethal nature of their products. Plaintiffs cite to the sworn testimony given in 1994 by the chief executive officers of the Defendant companies, before the House of Representatives Subcommittee on Health and Environment (which is part of the Committee on Energy and Commerce), stating that cigarette smoking is not addictive and that the companies did not manipulate or increase the level of nicotine in cigarettes. Compl. at ¶¶ 44, 61–63, 65–68.

Plaintiffs allege that Defendant companies, which control virtually 100% of the cigarette market in the United States, have conspired to deceive and mislead the

---

**3.** The facts cited below are taken from the First Amended Complaint, filed May 21, 1998, in the first case, Civil Action No. 98–704. The facts alleged are nearly identical in all three cases.

American public about the danger of their products in order to maintain their profits, to shield themselves from having to pay the healthcare costs of tobacco-related diseases, and to shift those costs to others. Compl. at ¶¶ 47, 50. This conspiracy adopted two strategies: to falsely represent to the public that the tobacco companies were creating a new and unbiased organization to provide trustworthy research and information about smoking and health, and to then rely on the public's acceptance of these representations to suppress, distort, and confuse the facts about the health dangers of tobacco products and nicotine addiction. Compl. at ¶ 50.

Plaintiffs allege that Defendants' plan was set in motion in 1954, as several scientific studies were issued that sounded warnings about the health hazards of cigarettes. Compl. at ¶ 71–72. The Defendant tobacco companies created a joint research organization, the Tobacco Institute Research Committee ("TIRC"), which in 1964 changed its name to the Council for Tobacco Research—USA ("CTR"). On January 4, 1954, as a result of a December 1953 hotel meeting of the chief executive officers of the leading cigarette manufacturers, all the companies, except Liggett, issued full page newspaper advertisements throughout the country, asserting that there was no proof that cigarette smoking was one of the causes of lung cancer, and announcing the formation of TIRC to provide independent research into all aspects of tobacco use and health. Compl. at ¶¶ 72, 76, 81–82. Thereafter, the industry continued to assure the American public, through an extensive public relations campaign, that there were no solid facts to prove the relationship between smoking and health problems, and that TIRC/CTR, as an independent and totally autonomous research organization, would provide trustworthy, reliable, and objective information. Compl. at ¶¶ 91–101.

Plaintiffs allege that despite these promises to report objective facts on smoking and health, the tobacco companies were already aware of the harmful and often lethal effects of smoking. Plaintiffs cite numerous internal memoranda from industry scientists at Philip Morris, Brown & Williamson, and Liggett, demonstrating the extensive knowledge on the part of those companies about the carcinogenic nature of cigarettes and the addictive nature of nicotine. Compl. at ¶¶ 85–89.

Plaintiffs allege that in 1968, worried about the growing public concern over the relationship between smoking and health problems, the tobacco companies agreed, in a so-called "Gentlemen's Agreement", that no individual company would perform research on smoking, health, and the development of "safe" cigarettes, and that any such information that existed would be suppressed and concealed. Compl. at ¶¶ 105–107.

Plaintiffs allege that TIRC/CTR was neither disinterested nor objective. They cite to internal industry memoranda demonstrating that the research organization was used to promote favorable research, to suppress negative research whenever possible, to attack negative research when it could not be suppressed, and to aid public relations and lobbying efforts on behalf of the industry. Compl. at ¶¶ 108–115, 117–120. In particular, according to internal Philip Morris correspondence, TIRC/CTR was to avoid research projects that would develop new tests for carcinogenicity, relate human disease to smoking, or conduct experiments which required large doses of carcinogens to show the addictive effect of smoking. Compl. at ¶ 116.

Plaintiffs allege that, as part of Defendants' ongoing conspiracy to deceive and mislead the American public, several tobacco companies, including Philip Morris, Reynolds, and Liggett, refused to produce or market various types of "safer cigarettes" that their researchers had developed after 20 years of effort. Compl. at ¶¶ 130–144. A memorandum written by counsel for the tobacco industry in 1987 stated that the marketing by Reynolds of a smokeless cigarette could "have significant

effects on the industry's joint defense efforts" and that the "industry position has always been that there is no alternative design for a cigarette as we know them [sic]." Compl. at ¶ 146.

Plaintiffs allege that the tobacco companies have known since at least the early 1960s of the addictive properties of nicotine, and cite numerous internal research memoranda by industry scientists to that effect, as well as a 1963 memorandum stating that "nicotine is addictive. We are, then, in the business of selling nicotine, an addictive drug effective in the release of stress mechanisms." Compl. at ¶¶ 148, 158.

Plaintiffs allege that despite this knowledge, the industry suppressed the publication of negative information about their products by ordering their scientists to keep their work secret, by closing down laboratories and destroying the animals which were used to gather the research, by forbidding scientists from publishing their data and threatening them with retaliation if they did, by involving lawyers in the research so they could later invoke the attorney-client privilege to hide any harmful research results, and by transferring potentially sensitive research to Switzerland and England. Compl. at ¶¶ 112, 114, 119–122, 124, 127, 151–155. In 1963, the General Counsel for Brown & Williamson advised the company to disclose to the U.S. Surgeon General, who was preparing his first official report on smoking and health, what the company knew about the addictiveness of nicotine and the adverse effects of smoking on health. The company rejected the advice. Compl. at ¶¶ 156–57.

Plaintiffs allege that the tobacco companies have developed and used highly sophisticated technologies designed to deliver nicotine in quantities that are more than sufficient to create and sustain addiction in the vast majority of individuals who smoke regularly. Compl. at ¶ 173. In particular, the Commissioner of the FDA told a Con-

gressional Subcommittee that Brown & Williamson developed a new and more potent tobacco plant called "Y–1", despite the company's denial that it had engaged in any breeding of tobacco for high or low nicotine levels. Compl. at ¶¶ 174, 175. This genetically-engineered tobacco plant had a nicotine content more than twice the average found naturally in flue-cured tobacco. Compl. at ¶ 177. In addition, despite denials from Brown & Williamson, its internal documents reveal that it and other companies add certain ammonia compounds during the manufacturing process, which increase the delivery and potency of nicotine, and almost double the nicotine transfer efficiency of cigarettes. Compl. at ¶ 182.

Plaintiffs allege that just as the tobacco companies have the capability to manipulate the amount of nicotine in cigarettes, the rate at which nicotine is delivered, and the addition of nicotine to any part of a cigarette, they also have the capability, with existing technology, to remove all or virtually all of the nicotine from their products. Compl. at ¶¶ 184, 185.

Plaintiffs allege that the tobacco companies have marketed low tar and low nicotine cigarettes which, in reality, have higher concentrations of nicotine, by weight, than high yield cigarettes. Compl. at ¶ 191.

Finally, Plaintiffs allege that the tobacco companies, as part of their conspiracy, fraud, and market manipulation, have used deceptive advertising to aggressively market addictive tobacco products to particular populations, such as minors. Compl. at ¶ 204. Using popular cartoons such as Joe Camel and popular figures such as the "Winston Man",[4] the tobacco industry has aimed its advertising at young people. Compl. at ¶¶ 206–207. Citing numerous internal industry documents analyzing the teen-age market and how to attract it, the use of "stealth" advertisements in movies, and the distribution of promotional items,

4. Plaintiffs probably mean the "Marlboro" Man rather than the "Winston" Man.

Plaintiffs claim that the industry's overall strategy was to intentionally replace the hundreds of thousands of tobacco users who die each year by unfairly and illegally targeting marketing and promotional efforts at minors, who are generally not as cognizant of their mortality as are adults. Compl. at ¶¶ 205, 210–217, 219–221, 225, 227, 228.

These are the allegations which, for purposes of the pending motions to dismiss, must be assumed to be true.

## II. Plaintiffs' Legal Theories

Plaintiffs seek to recoup healthcare funds expended on tobacco-related illnesses under several theories. Their first theory (Counts I, II, and III of the Amended Complaint) is based on the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(a), (c), and (d). Plaintiffs argue that Defendants engaged in a pattern and conspiracy of racketeering activity, and that they used proceeds from such activities to affect interstate and foreign commerce (e.g., pay lobbyists, make campaign contributions, perpetuate misinformation, manipulate nicotine levels, and shift healthcare costs to the Funds).

Plaintiffs' second theory of recovery (Counts IV and V) is based on federal and local antitrust laws: the Sherman Act, 15 U.S.C. § 1,[5] and D.C.Code §§ 28–4501–4508. Plaintiffs argue that Defendants conspired to unreasonably restrain trade in the tobacco products and healthcare markets by suppressing research about tobacco-related illnesses and hindering the development of nicotine-replacement products. Plaintiffs claim that Defendants' avoidance of the healthcare costs incurred by use of their products constitutes unreasonable restraint of trade in the healthcare market.

Plaintiffs' third theory of recovery (Count VI) is based on common law fraud. Plaintiffs argue that despite Defendants' express public promise to assume the responsibility to discover and disclose information about tobacco use, they intentionally and recklessly misrepresented and concealed such information.

Plaintiffs' fourth theory of recovery (Counts VII and VIII) is based on the common law concept of special duty. Plaintiffs argue that Defendants voluntarily assumed a duty to protect the public health by their public promise to pursue research regarding the effects of smoking. Plaintiffs claim that Defendants negligently and intentionally breached this special duty by misrepresenting and concealing such information.

Plaintiffs' fifth theory of recovery (Count IX) is indemnity. Plaintiffs allege that Defendants must indemnify them for tobacco-related healthcare costs because Defendants had a duty to pay such costs, and it would be unjust for Defendants not to indemnify Plaintiffs for discharging that duty.

Plaintiffs' sixth and final theory of recovery (Count X) is unjust enrichment. Plaintiffs allege that Defendants have been unjustly enriched by the transference of tobacco-related healthcare costs to Plaintiffs.

## III. Analysis

The fundamental question posed in the pending motions is whether Plaintiffs can recover for the economic injuries they have suffered as a result of the tobacco companies' lengthy conspiracy to mislead and deceive the American public about the strong evidence of the following: that nicotine is highly addictive, that the companies manipulated nicotine levels in cigarettes in order to create and sustain addiction, that

---

**5.** Although Plaintiffs bring their claim under the Sherman Act, it is in fact the Clayton Act, 15 U.S.C. § 15, that permits individuals to bring private enforcement actions under the Sherman Act. *GTE New Media Servs., Inc. v.* *Ameritech Corp.*, 21 F.Supp.2d 27, 40 (D.D.C. 1998). Consequently, any reference in this Opinion to the Clayton Act is also implicitly a reference to the Sherman Act.

smoking cigarettes is harmful to the health of all users, and that use of tobacco products must inevitably lead to substantially increased medical costs.[6]

Another way to examine this fundamental question is to ask whether our legal system can accomplish a task of such magnitude. Is it sufficiently flexible and responsive to the practical and doctrinal challenges posed by this case to devise a framework that allows Plaintiffs to have their "day in court", to tell their story to a jury, and—*if* Plaintiffs can prove the facts they have alleged—to obtain compensation for the injuries they have suffered? This task is particularly daunting in light of the allegations that, by virtue of their participation in a sophisticated and well-organized conspiracy, spanning a period of some forty-five years, Defendants played a major role in precipitating this nation's healthcare finance crisis,[7] thereby undermining the financial health and stability of Plaintiffs' industry.

This Court is of course well aware that four Circuit Courts of Appeals[8] have examined this issue in cases very similar to the ones before this Court (although some of the theories advanced by the plaintiffs in those cases vary somewhat from those advanced in these cases). Each of those courts concluded that the plaintiffs had no cause of action against the tobacco companies. Although rationales and emphases varied somewhat from case to case, all the Circuits ruled that, as a matter of law, plaintiffs' claims were too remote for the legal system to recognize, that the cases were too complex for ascertainment and apportionment of damages, and that there was too great a risk of multiple recoveries.

While this Court has studied the four Circuit opinions with great care and respect, they are of course not binding. Since our Court of Appeals has not yet had an opportunity to grapple with these questions, this Court writes on a clean slate until our Circuit speaks.

With all due respect to the four Circuit Courts that have spoken, this Court concludes that their rulings underestimate the inherent ability and flexibility of our common-law based legal system[9] to respond to

---

6. Again, the Court emphasizes that it must presume all factual allegations to be true at this early stage of the proceedings.

7. Many prominent figures believe that the current public healthcare crisis is due, in large part, to tobacco-related illnesses. Those who have spoken out include the American Medical Association, the American Cancer Society, the American Heart Association, the American Lung Association, the American Academy of Pediatrics, former Surgeon General C. Everett Koop, and current Surgeon General David Satcher. *See, e.g., AMA Reaction to the Landmark Verdict Against Big Tobacco,* P.R. Newswire, July 8, 1999; *Tobacco Field Industry Settlement; Groups Launch Campaign Against Deal,* Amer. Political Network, Apr. 23, 1997; *Text of Cancer Society Open Letter to State Attorneys General,* U.S. Newswire, Oct. 15, 1998; Mark Cheshire, *Battle Over Tobacco Settlement Intensifies; Ex–Surgeon General Joins Curran in Annapolis Campaign,* The Daily Record, Mar. 9, 1998, at 17; John McCain, *Smoking Bill Won't Blow Away,* Tucson Citizen, Apr. 13, 1998, at 5A; *American Cancer Society Opposes Global Tobacco Settlement,* P.R. Newswire, Apr. 24, 1997; *American Academy of Pediatrics Statement on Release of Final Regulations Imple-menting the Synar Amendment on Youth Access to Tobacco,* P.R. Newswire, Jan. 18, 1996; and David Satcher, *Save the Kids, Fight Tobacco,* Wash. Post, May 25, 1999, at A15.

8. *International Bhd. of Teamsters, Local 734 Health and Welfare Trust Fund v. Philip Morris Inc.,* 196 F.3d 818, 1999 WL 1034711 (7th Cir.1999); *Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.,* 191 F.3d 229 (2d Cir.1999), *petition for cert. filed,* 68 U.S.L.W. 3327 (U.S. Nov. 4, 1999)(No. 99–791); *Oregon Laborers–Employers Health & Welfare Trust Fund v. Philip Morris Inc.,* 185 F.3d 957 (9th Cir.1999), *petition for cert. filed,* 68 U.S.L.W. 3274 (U.S. Oct. 12, 1999)(No. 99–64); and *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.,* 171 F.3d 912 (3rd Cir.1999), *petition for cert. filed,* 68 U.S.L.W. 3251 (U.S. Sept. 27, 1999)(No. 99–54). The Court is aware of the many District Court cases which have reached similar conclusions, although a few have not.

9. Even though this case involves both statutory and common law causes of action, the central concepts of proximate cause and remoteness have developed over the years as common law liability-limiting theories.

the demands of a case as difficult as this. Over the years our legal system, which has grown less rigid and formalistic, has risen to the many challenges that have emerged in our increasingly complex and technological world. Indeed, one of the glories, and strengths, of our legal system has been its ability, over time, to respond to new problems—whether they arise from handling the logistical difficulties of mass tort class actions,[10] the technological difficulties of restructuring the AT & T communications system[11] and policing the information superhighway,[12] the scientific difficulties of assessing the validity of expert witness testimony,[13] or the profound ethical and moral difficulties of deciding reproductive technology and genetics issues.[14] In each of these instances, all involving cases of enormous public concern, courts and judges have accepted the challenges thrust before them and have carried out one of the primary functions of the legal system: to provide a procedurally fair forum in which parties can seek redress for their perceived wrongs.

More than a century ago, Justice Oliver Wendell Holmes eloquently described the growth and responsiveness of this country's legal system:

The life of the law has not been logic: it has been experience. The felt necessities of the time, the prevalent moral and political theories, intuitions of public policy, avowed or unconscious, even the prejudices which judges share with their fellow-men, have had a good deal more to do than the syllogism in determining the rules by which men should be governed. The law embodies the story of a nation's development through many centuries, and it cannot be dealt with as if it contained only the axioms and corollaries of a book of mathematics. Oliver Wendell Holmes, *The Common Law* (1881), *reprinted in* 3 *The Collected Works of Justice Holmes* 115 (Sheldon M. Novick ed., Chicago, The University of Chicago Press 1995).

The instant cases present just such a challenge to the ability of the courts to adjudicate an extremely complex case of enormous public interest and concern, in which great wrongs are alleged and damages—*if* warranted—will be difficult to ascertain.

However, we are not without guidance since the Supreme Court has provided the analytical framework for examining the viability of Plaintiffs' claims in two seminal cases: *Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)(hereinafter *AGC*), and *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). After determining that the standing requirements for RICO and antitrust claims are similar, the Supreme Court concluded that the standing analysis drawn from common-law principles of proximate cause and remoteness of injury is the most appropriate in evaluating such claims. *AGC*, 459 U.S. at 536–45, 103 S.Ct. 897;[15] *Holmes*, 503 U.S. at 267–

---

**10.** *See, e.g., In re Silicone Gel Breast Implants Prod. Liab. Litig.,* 887 F.Supp. 1447 (N.D.Ala. 1995); *In re Joint E. and S. Dists. Asbestos Litig.,* 798 F.Supp. 925 (E.D.N.Y.1992); *In re DES Cases,* 789 F.Supp. 552 (E.D.N.Y.1992); *In re Agent Orange Prod. Liab. Litig. MDL No. 381,* 818 F.2d 187 (2nd Cir.1987).

**11.** *United States v. American Tel. and Tel. Co.,* 552 F.Supp. 131 (D.D.C.1982).

**12.** *Reno v. American Civil Liberties Union,* 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997).

**13.** *See, e.g., Daubert ·v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *General Elec. Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

**14.** *See, e.g., Matter of Baby M,* 109 N.J. 396, 537 A.2d 1227 (1988); *Diamond v. Chakrabarty,* 447 U.S. 303, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980).

**15.** The Court in *AGC* emphasized that the "standing" required in antitrust cases (and consequently in RICO cases), was separate from the concept of standing as a constitutional doctrine. Under traditional standing

70, 112 S.Ct. 1311; *Steamfitters Local Union,* 171 F.3d at 921. Consequently, it is clear that the analysis of the remoteness issue, which is central to determining the viability of the majority of Plaintiffs' claims,[16] should be conducted under the rubric of standing doctrine.

In measuring proximate cause by the degree of remoteness of injury, the Supreme Court pointed out that, "[a]t bottom, the notion of proximate cause reflects 'ideas of what justice demands, or of what is administratively possible and convenient.'" 503 U.S. at 268, 112 S.Ct. 1311 (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser and Keeton on Law of*

Torts § 41, at 264 (5th ed.1984)). In other words, when a claim is too remote, there can be no proximate cause and, ultimately, no standing. Proximate cause itself is composed of the two elements by which we evaluate remoteness: public policy ("what justice demands"), and [17] identification of the plaintiff best suited to most efficiently present the damage claims ("administrative convenience").[18]

## A. Proximate Cause: Public Policy

Courts have struggled with the concept of proximate cause for much of this century.[19] As the Second Circuit has noted,

---

doctrine, a plaintiff must show: (1) she has suffered a concrete, personal, and particularized "injury in fact" to a legally protected interest; (2) a causal connection between the injury and the action of the defendant, fairly traceable to the challenged action; and (3) a likelihood, as opposed to mere speculation, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In *AGC,* the Court ruled that in addition to this determination, "the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." *AGC,* 459 U.S. at 535 n. 31, 103 S.Ct. 897.

**16.** The remoteness issue does not apply to Plaintiffs' indemnity claim, which is based on contract law, or to Plaintiffs' unjust enrichment claim, where the analysis focuses on a benefit conferred rather than a duty owed.

**17.** In *Holmes,* the Supreme Court stated that proximate cause consists of public policy *or* administrative convenience, implying that one or the other applied to a particular situation. However, when that statement is read in context with the rest of the opinion, as well as in conjunction with *AGC,* it is clear that the Supreme Court meant that proximate cause rests on considerations of *both* public policy and administrative convenience.

**18.** It should be noted that in examining the elements of proximate cause, there are different roles to be played by the court and the factfinder. Both the *Restatement* and *Prosser and Keeton on Law of Torts* agree that the court makes the threshold determination of whether there is sufficient evidence regarding what actually occurred that a jury could reasonably differ as to whether the defendant's

conduct was a substantial factor in causing plaintiff's harm. Restatement (Second) of Torts § 434 (1965); W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser and Keeton on Law of Torts* § 45, at 319–21 (5th ed.1984)(hereinafter *Prosser & Keeton on Torts* ). Thus, while the jury should ultimately decide whether proximate cause exists, that responsibility is given to it only after the court concludes that there is sufficient evidence from which that jury could reasonably conclude that it exists.

Another threshold determination that must be made by the court is whether there are policy reasons that, as a matter of law, require the court to enter judgment in defendant's favor. As the District of Columbia Court of Appeals has noted:
a defendant cannot be held liable unless that defendant has in fact caused the plaintiff's harm, and then only if certain "liability-limiting considerations which relieve the defendant of liability for the harm he actually caused" are not applicable. Although it is often said that proximate cause is an issue for the jury, it can also be a question of law for the court to consider in the first instance, before the case even goes to the jury. If there is insufficient evidence for a reasonable jury to find that the defendant's conduct caused harm to the plaintiff, the court must direct a verdict for the defendant. *Claytor v. Owens–Corning Fiberglas Corp.,* 662 A.2d 1374, 1382 (D.C.1995)(internal citations and footnotes omitted).

**19.** *See, e.g., Wood v. Pennsylvania R.R. Co.,* 177 Pa. 306, 35 A. 699 (1896); *Palsgraf v. Long Island R.R. Co.,* 248 N.Y. 339, 162 N.E. 99 (1928); *Mauney v. Gulf Ref. Co.,* 193 Miss. 421 (1942); *Longberg v. H.L. Green Co.,* 15 Wis.2d 505 (1962).

"[a]ny discussion of proximate cause should be approached with some trepidation because, as a scholarly treatise teaches, no topic is subject to more disagreement or such confusion. Proximate cause is an elusive concept, one 'always to be determined on the facts of each case upon mixed considerations of logic, common sense, justice, policy and precedent.'" *Laborers Local 17*, 191 F.3d at 235 (internal citations and quotations omitted).

The Supreme Court has recognized that while the courts have used words such as "remote," "tenuous," "fortuitous," "incidental," or "consequential" to describe those injuries that fall outside the rubric of proximate cause and therefore have no remedy at law, the use of this broad spectrum of terms "only emphasizes that the principle of proximate cause is hardly a rigorous analytic tool." *Blue Shield of Va. v. McCready*, 457 U.S. 465, 478 n. 13, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982). Perhaps the most candid definition of this elusive term was given more than 70 years ago by Justice Andrews in his oft-quoted dissent in *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 352, 354, 162 N.E. 99 (1928):

> What we do mean by the word 'proximate' is that, because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point. This is not logic. It is practical politics... There is in truth little to guide us other than common sense.

The Supreme Court echoed this sentiment when it recognized that the term "proximate cause" is a generic label for "the judicial tools used to limit a person's responsibility for the consequences of that person's own acts." *Holmes*, 503 U.S. at 268, 112 S.Ct. 1311 (quoting *Prosser & Keeton on Torts* § 41, at 264). In light of the confusion in the existing law, an understanding of proximate cause requires a brief look at its historical development.[20]

Judges and scholars studying the concept have recognized that while an event can be the cause-in-fact of an injury (i.e., the "but for" or scientific cause), such simplistic causation theory is insufficient, in and of itself, to assign liability.[21] *See generally Prosser & Keeton on Torts* § 41, at 272–80; *Claytor*, 662 A.2d at 1382; Restatement (Second) of Torts § 431, Comment d (1965). Two recurrent theories have emerged in the debates regarding how liability should be limited once cause-in-fact has been established. The first theory is that of "foreseeable risks" (sometimes called foreseeable consequences), which holds an actor liable for all the risks or consequences that were foreseeable effects of his conduct. The second theory is that of "direct consequences," which holds an actor liable only for those risks that are directly traceable to his conduct. *Prosser & Keeton on Torts* § 41, at 273.

The foreseeable risks/consequences theory, limiting liability to those injuries that were the foreseeable results of a defendant's conduct, is the most widely accepted.[22] This theory has spawned many variations, which attempt to make it more concrete, to address some of its conceptual difficulties, and to make it a more reliable

---

**20.** For a more extended study of the historical development of proximate cause, see *Prosser & Keeton on Torts* §§ 41–45, at 263–321.

**21.** The most well-known example of this principle comes from *Palsgraf*. In *Palsgraf*, a passenger who was in danger of falling off a train was pushed back onto the train from behind by a guard standing on the platform; the guard's action caused the passenger to lose hold of his package, which fell on the rails. The package happened to contain fireworks, and exploded when it fell. The shock of the explosion caused a scale on the other end of the platform to fall, thereby injuring Ms. Palsgraf. Thus, "but for" the push that the guard gave the passenger, Ms. Palsgraf would never have been injured; yet the *Palsgraf* court found that causation-in-fact was insufficient to assign liability to the train company.

**22.** *Prosser & Keeton on Torts* §§ 42–43, at 272–81.

predictor of liability.[23] These variations recognize that there must be some point at which the defendant's liability for his conduct is limited, even though in retrospect an actual consequence will always appear foreseeable.[24]

Although the Restatement of Torts has adopted one version of the foreseeable consequences theory, it also incorporates, to some extent, the direct consequences theory. Under the Restatement, the two elements necessary to prove legal cause are (1) that the tortious conduct was a substantial factor in bringing about the harm, and (2) that there are no applicable rules of law limiting liability. Restatement (Second) of Torts § 431 (1965).

The first of these elements is defined in terms of the directness of the injury to the conduct: the components of the "substantial factor" element include the number of other factors and the extent to which they contributed to the harm; whether the injury and conduct are connected by an uninterrupted and active series of forces; and the lapse of time between the injury and the conduct. Restatement (Second) of Torts § 433 (1965). As to the second element, the Restatement does not include all the possible rules of law that may limit liability, but does provide one, which is a variation of the foreseeable risks theory. That rule of law states that there is no liability if "it appears to the court highly extraordinary that [the actor's conduct]

should have brought about the harm." Restatement (Second) of Torts § 435 (1965).

The Restatement's explanation of the requirements for proving proximate cause is particularly significant because this jurisdiction[25] has explicitly adopted them. *District of Columbia v. Frick*, 291 A.2d 83, 84 (D.C.1972). The "plaintiff must prove that the allegedly negligent conduct 'played a substantial part in bringing about the injury and the injur[y] was either a direct result or a reasonably probable consequence of the conduct.'" *District of Columbia v. Walker*, 689 A.2d 40, 46 (D.C. 1997) (internal quotations and citations omitted). Before the plaintiff can be given an opportunity to go to the jury, however, the court must first decide, as a matter of law, whether there are any "policy considerations that limit the liability of persons who have, in fact, caused the injury 'where the chain of events appears highly extraordinary in retrospect.'" *Ferrell v. Rosenbaum*, 691 A.2d 641, 650 (D.C.1997) (internal quotations and citations omitted).

The Restatement makes little substantive differentiation between the application of proximate cause to negligent and intentional torts. With regard to the latter, the Restatement requires consideration of the following three additional factors, all of which are really subsumed under considerations of public policy: the actor's "inten-

**23.** *See id* § 42, at 274.

**24.** *See id.* § 43, at 281–93, for further explanation of these variations, along with corresponding citations. See, in particular, the description of foreseeability contained in *Mauney v. Gulf Ref. Co.*, 193 Miss. 421, 9 So.2d 780, 781 (1942), a variation of which was later adopted by the Supreme Court in *Milwaukee & St. Paul R.R. Co. v. Kellogg*, 94 U.S. 469, 475, 24 L.Ed. 256 (1876):

The area within which liability is imposed is that which is within the circle of reasonable foreseeability, using the original point at which the negligent act was committed or became operative, and thence looking in every direction as the semi-diameters of the circle; and those injuries which from this

point could or should have been reasonably foreseen, as something likely to happen, are within the field of liability, while those which, although foreseeable, were foreseeable only as remote possibilities, those only slightly probable, are beyond and not within the circle—in all of which time, place and circumstance play their respective and important parts.

**25.** Under *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), the substantive law of the forum state (in this case, the District of Columbia) is applied to questions of liability in common law causes of action. *Gray v. American Express Co.*, 743 F.2d 10, 16 (D.C.Cir.1984); *Answering Serv., Inc. v. Egan*, 728 F.2d 1500, 1506 (D.C.Cir. 1984).

tion to commit an [injury], the degree of his moral wrong in acting, and the seriousness of the harm which he intended ..." Restatement (Second) of Torts § 435B (1965). None of the Circuit Courts that have ruled in the union trust fund cases have differentiated between negligent and intentional torts in their analysis of proximate cause. *See Steamfitters Local Union*, 171 F.3d at 917, 921 (recognizing that "proximate cause inquiry ... is complicated by the allegations of intentional tort," but failing to discuss this complication in analysis of proximate cause); *Laborers Local 17*, 191 F.3d at 234–36 (no analysis of proximate cause requirement for intentional torts); *Oregon Laborers–Employers Health and Welfare Trust Fund*, 185 F.3d at 963–66 (same); *International Bhd. of Teamsters*, 196 F.3d at 825 (no analysis of proximate cause). Because the intentionality of the alleged actions informs the public policy element of proximate cause, this Court will also not differentiate between negligent and intentional torts in its proximate cause analysis.

And thus the analysis comes full circle—from Justice Holmes to *Palsgraf* to the Restatement to the Supreme Court's opinion in *Holmes*—back to the conclusion that proximate cause mandates consideration of "what justice demands." Despite the twists and turns that proximate cause theory has taken over many years of both academic and judicial analysis, there is overwhelming agreement that the analysis requires inclusion of public policy issues. We must now undertake such an examination of "what justice demands" in this case.

Taking all of Plaintiffs' allegations as true regarding Defendants' long-standing knowledge about the addictive nature of nicotine and the harmful effects of smoking, it is clear that they show a 45–year conspiracy to addict smokers (especially teenagers) and thereby cause them grave medical harm, to manipulate nicotine levels, to prevent and suppress research into the dangers of smoking, and to mislead and deceive the American public about the dangers of smoking.

The foreseeable consequences of such conduct are obvious. Millions of people will develop the vast array of pulmonary, cardiovascular, and malignant conditions that Plaintiffs have alleged in their complaint. Those conditions will make extraordinary demands on the healthcare community. The economic costs of the services provided by the healthcare community to Fund participants will be reimbursed by Plaintiff Funds. The financial stability of the Funds will be endangered and undermined by the outlay of billions of dollars to reimburse healthcare providers for services to Fund participants. Because of these extraordinary outlays, the financial resources of the Funds will be diverted to making those reimbursements, rather than mounting anti-smoking campaigns, designing and operating nicotine addiction treatment programs, and developing nicotine-free alternatives to cigarettes. This chain of events demonstrates that it is *not* "highly extraordinary" that Defendants' conduct caused Plaintiffs' harm.

The foreseeability analysis can also be expressed in much simpler and starker terms. Tobacco products contain nicotine, which is addictive. These addictive products will cause devastating health problems to those who use them. Patients will receive billions of dollars worth of services from healthcare providers. Someone must pay for those services. These Plaintiffs, health and welfare funds, are legally obligated to pay for the medical services provided to their participants. Paying for those medical services will jeopardize the financial stability of the Funds, leaving them unable to use their resources for prevention and treatment programs and for developing alternatives to smoking.

If Plaintiffs can ultimately prove their allegations,[26] can there really be any doubt

26. Much remains to be done before Plaintiffs'

charges can be allowed to undergo a jury's

that sound public policy demands that they be given an opportunity to do so? To close the courthouse door to them, in light of the magnitude of the harm alleged and the moral turpitude[27] of the conduct alleged, would be a far cry from the "rough sense of justice" that Justice Andrews recognized as part of the proximate cause equation so long ago in *Palsgraf*.[28]

If Plaintiffs can prove all they allege in their complaint, a jury could reasonably find, by a preponderance of the evidence, that Defendants' behavior played a "substantial part" in causing Plaintiffs' injuries, and that those injuries were "either a direct result or a reasonably probable consequence of [Defendants'] conduct." *Walker*, 689 A.2d at 46.

■ In short, as to the public policy prong of the proximate cause analysis, this Court concludes that there are no liability-limiting considerations which compel a ruling that, as a matter of law, Plaintiffs' injuries were not proximately caused by Defendants' conduct. Indeed, public policy considerations militate to the contrary. It would be nothing short of unconscionable to conclude that foreseeable wrongs of such magnitude and moral culpability, if proven, must go unremedied because our legal system deemed them unworthy of recognition.[29]

There is thus no public policy consideration that requires finding, as a matter of law, that Plaintiffs' injuries were not proximately caused by Defendants' conduct.

## B. Proximate Cause: Administrative Convenience

■ As to the second element of proximate cause, administrative convenience, the Supreme Court in *Holmes* developed a framework for analyzing the proximity of the relationship between the injury and the conduct. This framework requires balancing the following three factors to determine whether a plaintiff may proceed with her claim: (1) is there a more directly-injured victim who can be counted on to vindicate the law as a private attorney general; (2) how difficult is it to ascertain the amount of plaintiff's damages, given that the less direct the injury, the more difficult it is to ascertain those damages; and (3) is adoption of complicated rules for apportioning damages necessary to obviate the risk of multiple recoveries? *Holmes*, 503 U.S. at 269–70, 112 S.Ct. 1311.

scrutiny. All discovery must be completed, summary judgment motions must be litigated, and pre-trial preparations must be made.

27. *See* Restatement (Second) of Torts § 435B (1965).

28. In their renowned text on torts, Prosser and Keeton recognize that the legal limitation on the scope of liability rests, to a great extent, on considerations of public policy. Legal responsibility is "limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability." *Prosser & Keeton on Torts* § 41, at 264. While "[s]ome boundary must be set to liability for the consequences of any act, [it must be set] upon the basis of some social idea of justice or policy." *Id.*

29. Judge Jack B. Weinstein, in the Eastern District of New York, summarized his proximate cause analysis in far stronger language:

it is difficult to imagine a set of circumstances which would militate more strongly in favor of a finding of proximate cause and liability than the present one. If the allegations are to be believed, the defendants in this suit are responsible for one of the most colossal and reproachful frauds in the history of American society. If proven to be true, the allegations demonstrate that the defendants intentionally bargained away the lives and health of tens of millions of Americans for profit. While the law is forced to address allegations of malfeasance on a continual basis, rarely if ever have American courts been faced with allegations of fraud so nefarious in nature, so wide in scope, or so broad in impact. The moral blame attached to such conduct, and society's policy in preventing harms in the future, could scarcely argue more strongly in favor of a finding of proximate cause. *Blue Cross and Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 36 F.Supp.2d 560, 584 (E.D.N.Y.1999).

### 1. Is There a More Directly– Injured Plaintiff?

Defendants argue that Plaintiffs are not the best parties to bring these claims because they were not directly injured by Defendants' conduct, and that there are many other directly-injured individuals who can be counted on to vindicate the law. Defendants further argue that Plaintiffs' only remedy for their injuries is subrogation, that the subrogation remedy is adequate, and therefore Plaintiffs are precluded from seeking recovery on direct claims.

■ Defendants' arguments are unpersuasive for four reasons. First, Plaintiffs are the only parties who can bring suit on behalf of the trust assets. No other person or entity stands in the legal position to recover for depletion of trust assets. There is simply no dispute that Fund participants would not be entitled to sue to recover trust assets.

Second, the Fund participants are not in any position to vindicate the RICO and antitrust claims brought by the Funds, because, as discussed below, a plaintiff must prove an injury to business or property, and cannot recover for personal injuries.[30] For example, even if a Fund participant could allege an antitrust injury as a consumer in the relevant market, it would be practically impossible for that participant to allege an injury outside of the personal injuries to his or her own health.

Third, and most importantly, the Supreme Court has *never* ruled that a plaintiff's injuries are too remote without first identifying a plaintiff who was more directly injured and better able to vindicate the law as a private attorney general. *See, e.g., Illinois Brick Co. v. State of Ill.,* 431 U.S. 720, 735, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) (direct purchasers were more

directly injured and could vindicate antitrust violations); *AGC,* 459 U.S. at 540–42, 103 S.Ct. 897 (landowners and contracting parties were more directly injured and could vindicate antitrust violations; "[d]enying the Union a remedy on the basis of its allegations in this case is not likely to leave a significant antitrust violation undetected or unremedied"); *Holmes,* 503 U.S. at 273, 112 S.Ct. 1311 (broker-dealers were more directly injured and could vindicate RICO violations).

In contrast, Plaintiffs, as fiduciaries of the trusts, are able to bring suit to recover damages to the Funds' business and property, i.e., the trust assets. Consequently, Plaintiffs are not only the most suitable, but the only suitable parties to bring the RICO and antitrust claims, to serve as private attorneys general, and to vindicate the law on behalf of the Funds.

■ Fourth, Defendants' contention that Plaintiffs' sole remedy is subrogation must also · be rejected. The doctrine of subrogation allows an insurance company to pursue, on behalf of its insured, any claims the insured may have against the party that injured him and caused the insurance company to incur costs. Plaintiffs, however, claim direct injuries to the trust assets, and do not seek to recover for injuries to their participants. Specifically, Plaintiffs claim injuries to their infrastructure and financial health and stability, to their ability to invest in smoking cessation/reduction programs for their participants, and programs designed to improve the general health and well-being of their participants. Plaintiffs *could not* recover for these injuries under subrogation, because they would remain uncompensated for any injuries other than those personally suffered by their participants.

*Oregon Laborers–Employers Health and Welfare Trust Fund,* 185 F.3d at 964. The Seventh Circuit's opinion failed to address the issue. *International Bhd. of Teamsters,* 196 F.3d 818 (7th Cir.1999).

---

30. Three of the Circuit Courts which addressed the three *Holmes* factors substantially agreed that there are no better-situated plaintiffs to vindicate Plaintiffs' RICO and antitrust claims. *Steamfitters Local Union,* 171 F.3d at 933; *Laborers Local 17,* 191 F.3d at 241;

## 2. Will There be Difficulty Ascertaining Plaintiffs' Damages?

Defendants argue that it would be difficult if not impossible to ascertain Plaintiffs' damages based on their theory that the Funds themselves were harmed directly, completely apart from the harm done to their participants. Defendants contend that Plaintiffs' injuries are necessarily derivative of the injuries suffered by their participants, thus preventing Plaintiffs from neatly segregating the injury to the Funds from the injury to the participants.

■ Defendants, however, overlook several critical considerations. First, as noted earlier, in a motion to dismiss, the Court must accept as true the allegations in the Complaint. Plaintiffs argue they can prove, through expert testimony and statistical models, that their injuries are direct and separate from the injuries to their participants. At this early stage, the Court has no basis for rejecting this allegation and reaching a different conclusion. Defendants are essentially asking the Court to decide, without the benefit of discovery, depositions, and testimony (all of which the Supreme Court was able to rely on in *Holmes,* 503 U.S. at 263–64, n. 5, 112 S.Ct. 1311), that Plaintiffs cannot prove their case. Plaintiffs, on the other hand, argue that they can. It is not the Court's function to decide, in a motion to dismiss, as opposed to a motion for summary judgment at the close of discovery, whether Plaintiffs can develop the evidence to support their claims.

Second, a close look at Plaintiffs' complaint reveals that, if Plaintiffs' allegations are true, Defendants' activities did in fact bring real injury to the Funds' trust assets

separate and apart from the harm to their participants: the trust assets were greatly diminished by medical expenditures necessitated by Defendants' conduct; in the absence of these expenditures, the Funds could have invested in programs designed to reduce smoking among their participants, or programs designed to improve the general health and well-being of their participants; because of these enormous expenditures, the financial stability of the Funds has been threatened. Because Defendants prevented Plaintiffs from obtaining accurate information on cigarette products, and prevented the introduction of safer products into the market, Plaintiffs were unable to take direct action to reduce smoking among their participants.

In summary, it is far too early at this stage of the litigation, with no facts and only speculative arguments to support a different conclusion, to say that Plaintiffs could not conclusively prove the damages they have suffered above and beyond those recoverable under subrogation.

## 3. Can the Court Appropriately Apportion Damages and Avoid Multiple Recoveries?

Defendants argue that because Plaintiffs' injuries are necessarily derivative of those suffered by the Funds' participants, the danger of duplicative recovery is great, and the Court would have to develop complex and convoluted formulas to apportion damages between the different parties which might claim entitlement to any recovery gained: e.g., the Funds, the Funds' participants, employers contributing to the Funds, and health insurers with whom the Funds may have contracted for health services.[31]

---

**31.** Although the four Circuit Courts that have ruled in union trust fund cases all found this factor in Defendants' favor, this Court believes that the reasoning relied on by these courts is flawed. The Third Circuit notes that Fund participants might bring claims under RICO and antitrust laws for out-of-pocket expenses incurred as a result of Defendants' activities, requiring apportionment of dam-

ages. *Steamfitters Local Union,* 171 F.3d at 933. However, the court seems to have overlooked the fact that individual smokers cannot sue under the RICO and antitrust statutes, because they can only recover for injury to business or property, not personal injuries. *Id.* Furthermore, the court goes on to say that there is no better party that could vindicate the Funds' RICO claims. *Id.* The Second

With this *Holmes* factor as with the last, Defendants overlook several critical considerations.[32] First and foremost, the Funds are separate entities, distinct from the other parties enumerated by Defendants. The Funds have responsibilities and fiduciary duties to preserve the trust assets, and to ensure that the trust assets are not wrongfully diminished. Any harm done to the trust assets cannot be personally recovered by any party other than the Funds; the Funds' harm is sole and separate from that suffered by the Funds' participants, and encompasses injuries that the participants could not recover for, including loss of financial health and stability, and inability to provide their participants with effective smoking-cessation and other general health programs because of their inability to obtain accurate information on smoking.

Second, Defendants overlook the existence of the single satisfaction rule. *See Lamphier v. Washington Hosp. Ctr.*, 524 A.2d 729, 734 (D.C.1987). The single satisfaction rule would allow Defendants to get credit for damages paid to these Plaintiffs should there be any subsequent lawsuits awarding damages to Fund participants, employers, or health insurers, to the extent those damages overlapped. Consequently, Defendants' fear of multiple recoveries is not an effort to protect against duplicative recoveries, but an effort to prevent *any* recovery. This is not what the *Holmes* Court had in mind when it announced the policy considerations behind the rule of remoteness.

■ Because the Funds seek to recover only for depletion of the trust assets, because they are the only plaintiffs who can recover for this harm, and because the single satisfaction rule will protect against any subsequent duplicative recoveries, Defendants have presented no arguments warranting dismissal of any of Plaintiffs' claims because of an inability to apportion damages or avoid multiple recoveries.

Thus upon review of the three *Holmes* factors bearing on administrative convenience, the Court concludes that Defendants have failed to present convincing arguments that, as a matter of law, Plaintiffs' injuries are so remote that a jury could not reasonably find that Defendants proximately caused their injury. This is not to say, after further discovery and full disclosure of expert testimony, statistical models, mathematical formulas, etc., that Defendants will not be able to renew these arguments with more success, when they have concrete evidentiary proffers to attack. However, at the stage of a motion to dismiss for failure to state a claim, where *Conley* instructs the Court to liberally construe the complaint and draw all factual inferences in favor of the Plaintiffs, it cannot be said that they necessarily stand in too remote a position to recover from the injuries they allege.

\* \* \* \* \* \*

In sum, after long and intense consideration of the parties' briefs and the many rulings other courts have issued in similar

Circuit admits that there is no risk of double recovery by the smokers under the RICO claims, and that the employers could not recover for injuries to the Funds. *Laborers Local 17*, 191 F.3d at 240–41. The Ninth Circuit, though admitting that smokers cannot recover under RICO and antitrust laws, and that there is some protection from multiple recovery under state law, baldly states, without any supporting analysis, that these facts do not cure the problem that courts would have to adopt complicated rules for apportioning damages. *Oregon Laborers–Employers Health and Welfare Trust Fund*, 185 F.3d at 965–66. It seems inappropriate, at this early stage, to dismiss a case on speculation that

such complicated rules might be necessary. The Seventh Circuit's only mention of this *Holmes* factor is contained in the following phrase: "the risk of double recovery [is] palpable because smokers can file their own RICO suits." *International Bhd. of Teamsters*, 196 F.3d at 825. As did the Third Circuit, the Seventh Circuit appears to have overlooked the fact that individual smokers cannot, in fact, file their own RICO suits.

**32.** ⸰ It should be noted that the courts are no strangers to complex formulas and rules of apportionment.

cases, this Court has become convinced that the complexity of this case does not, particularly at this early point in its development, require its dismissal for the remoteness of Plaintiffs' claims and the difficulties of ascertaining and apportioning damages. As·has been discussed, the proximate cause analysis mandated by *Holmes* requires consideration of public policy factors. That balancing of factors, especially in light of the significance of the public health questions, weighs heavily in favor of finding that Plaintiffs' claims are sufficiently related to the conduct alleged that Defendants must be held legally accountable if those claims are found to have merit. As to administrative convenience, the other factor which *Holmes* requires us to consider in our proximate cause analysis, the creativity of counsel and their experts as well as the disclosures mandated by the discovery process will reveal whether the difficulties of ascertaining and apportioning damages can be overcome. There is nothing inherent in Plaintiffs' claims or the structure of our trial procedure to suggest that this cannot be accomplished.

## C. Independent Grounds for Dismissal

In addition to their primary argument regarding the remoteness of Plaintiffs' injuries, Defendants advance several additional grounds for dismissing Plaintiffs' claims.

### 1. RICO claims

Defendants argue that Plaintiffs have failed to show the requisite injury to their business or property, as required by RICO, because their injuries are derivative of their participants' personal injuries. Because RICO prohibits recovery for purely personal injuries, Defendants contend that Plaintiffs' RICO claims must fail.

The civil remedy provision of RICO allows "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter [to] sue therefor in any appropriate United States dis-

trict court ..." 18 U.S.C. § 1964(c). The "business or property" clause has been interpreted to preclude recovery for personal injuries. *See Morrison v. Syntex Labs., Inc.,* 101 F.R.D. 743, 744 (D.D.C. 1984); *see also Pilkington v. United Airlines,* 112 F.3d 1532, 1536 (11th Cir.1997); *Oscar v. University Students Co-op. Ass'n,* 965 F.2d 783,. 785 (9th Cir.1992)(en banc), *cert. denied,* 506 U.S. 1020, 113 S.Ct. 655, 121 L.Ed.2d 581 (1992); *Grogan v. Platt,* 835 F.2d 844, 846–47 (11th Cir.1988), *cert. denied,* 488 U.S. 981, 109 S.Ct. 531, 102 L.Ed.2d 562 (1988).

Defendants' arguments, although dressed in the language of the RICO statute and supporting caselaw, are really nothing more than the remoteness arguments made in the section above, and therefore do not need to be repeated here. As noted earlier, Plaintiffs clearly state that the injuries for which they seek to recover are the injuries to the trust assets. Plaintiffs do not merely seek reimbursement for the medical costs expended on behalf of their beneficiaries, for this would clearly fall within the prohibition against such recovery in the statute and caselaw.

■ Injury to the trust assets is an injury to "business or property." The injuries to the trust assets that Plaintiffs allege include loss of financial health and stability, and inability to provide their participants with effective smoking-cessation and other general health programs. It remains to be seen whether Plaintiffs can satisfactorily segregate the injuries to the trust assets from the derivative injuries to their participants, but it is too early in the litigation to make this determination.

### 2. Antitrust claims

The antitrust statutes under which Plaintiffs bring their claims also have a "business or property" requirement. 15 U.S.C. § 15; D.C.Code § 28–4508(a). In addition to the business/property argument discussed above, which will not be repeated, Defendants argue that Plaintiffs'

antitrust claims should be dismissed because Plaintiffs have failed to meet the *AGC* "antitrust injury" requirement.

■ In *AGC*, the Supreme Court set forth several factors to be considered when determining whether a plaintiff has stated a claim under the Clayton Act, and thus suffered an "antitrust injury".[33] First, Plaintiffs' injury must be of the type Congress sought to redress through the antitrust statutes. *AGC*, 459 U.S. at 538–40, 103 S.Ct. 897. This factor is sometimes referred to as the "consumers or competitors" factor, because Plaintiffs must be consumers or competitors in the relevant market in order to suffer injuries of the type contemplated by the antitrust statutes. *Id.* at 539, 103 S.Ct. 897. Second, using the *Holmes* analysis, Plaintiffs' injuries cannot be too direct or remote. *Id.* at 540–45, 103 S.Ct. 897. This issue has already been addressed in the Court's discussion of remoteness, *supra* at 78–89. Third, Plaintiffs' injuries cannot be too speculative. *Id.* at 542, 103 S.Ct. 897.

Plaintiffs attempt to bring their claims within the "consumers or competitors" framework, the first element under *AGC*, in two ways. First, they argue that both they and Defendants participate in the relevant market, Defendants as sellers and Plaintiffs as prospective buyers of nicotine products.[34] According to Plaintiffs, the nicotine products market encompasses all nicotine products, including nicotine replacement products. Plaintiffs argue that they would have covered, paid for, and encouraged the use of substitute nicotine products for treatment, had such products not been fraudulently kept off the market.

■ Plaintiffs' theory is implausible. At best, Plaintiffs would have an unusually difficult task proving that, but for Defendants' conduct, they would have been direct consumers in the nicotine products market. More significantly, the injuries Plaintiffs allege are not the sort of anticompetitive injuries Congress intended to redress through the antitrust statutes.

Even assuming that Plaintiffs would have paid for or encouraged the use of nicotine replacement products, had they been available, Plaintiffs would not have been "consumers" in that market in the usual sense of that word. The actual consumers or users would still be the Funds' participants, and the Funds' reimbursement for such products would make them, at most, indirect purchasers. The right of an indirect purchaser to sue under the antitrust laws was addressed and rejected in *Illinois Brick*. Infrastructure damages, the injuries Plaintiffs allege, are not the type that would result from anticompetitive activity in the nicotine products market, at least as the antitrust statutes contemplate such injuries.

Second, Plaintiffs try to bring their situation within the "consumers or competitors" framework by arguing that that requirement is not applicable to an antitrust claim. Plaintiffs' support for this contention lies in one paragraph from *McCready*, 457 U.S. at 472, 102 S.Ct. 2540, where the Supreme Court, relying on a quote from a 1948 case,[35] stated that the antitrust stat-

**33.** Since the District of Columbia antitrust statutes strive for uniformity with the federal statutes, the analysis will be the same for Plaintiffs' federal and state antitrust claims. D.C.Code § 28–4515 ("It is the intent of the Council of the District of Columbia that in construing this chapter, a court of competent jurisdiction may use as a guide interpretations given by federal courts to comparable antitrust statutes."). *See, e.g., Shepherd Park Citizens Ass'n v. General Cinema Beverages of Wash., D.C., Inc.*, 584 A.2d 20, 22 (D.C.1990).

**34.** Plaintiffs also argue that Plaintiffs and Defendants are both participants in the health-care market, in which Defendants also restrained trade. Plaintiffs have, however, failed to fully explain the convoluted logic that would include Defendants in the health-care market, and this argument will not be further addressed.

**35.** *Mandeville Island Farms v. American Crystal Sugar Co.*, 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948).

utes do not confine their protection to consumers, competitors, or sellers.

Plaintiffs' reliance on *McCready* is misplaced. First, the plaintiff in *McCready* was herself a consumer in the relevant market, as recognized by the Court the very next year, when it decided *AGC*. *AGC*, 459 U.S. at 529 n. 19, 103 S.Ct. 897. Second, in *AGC* the Court rejected that reading of the Clayton Act because it would "encompass every harm that can be attributed directly or indirectly to the consequences of an antitrust violation." *Id.* at 529, 538–45, 103 S.Ct. 897. Third, a literal reading of the phrase in *McCready* upon which Plaintiffs rely does not necessitate the conclusion Plaintiffs reach. While the protections of the antitrust statutes may carry over to groups other than the consumers and competitors in a particular market, that does not mean that anyone other than a consumer or competitor in that market may bring suit under those statutes.

Finally, Plaintiffs argue that their damages are not so speculative as to warrant dismissing their antitrust claims. However, given the fact that they are neither consumers nor competitors in the relevant market, it is difficult to see how Plaintiffs' antitrust injuries would *not* be speculative. While Plaintiffs might be able to prove damages for purposes of their other claims, the injuries they allege are too speculative in the antitrust context, given their failure to explain how they were or would have been participants in the relevant market.

Because Plaintiffs have failed to show that they suffered an antitrust injury as consumers or competitors in the relevant market, and because they have failed to specify their antitrust damages, Plaintiffs have failed to state a claim under the antitrust statutes.

### 3. Fraud Claim

Defendants argue that Plaintiffs' fraud claim should be dismissed, first, because Plaintiffs failed to show how they justifiably relied on Defendants' alleged fraudulent concealments and representations, and second, because Plaintiffs failed to plead this claim with particularity.

As to the first point, Defendants argue that it is insufficient for Plaintiffs merely to allege reliance, and that they must allege justified reliance. Defendants further note that any reliance by Plaintiffs would not be justified, given that cigarette warning labels have been on cigarette packages for over thirty years.

█ Defendants cite to two cases for their assertion that Plaintiffs must plead justified reliance. Neither case stands for the proposition Defendants assert. In *Hercules & Co., Ltd. v. Shama Restaurant Corp.*, 613 A.2d 916, 923 (D.C.1992), the District of Columbia Court of Appeals held that the plaintiff must additionally plead that his reliance is justified only in "cases involving commercial contracts negotiated at arm's length ..." This is obviously not the case here, since we are not dealing with "commercial contracts negotiated at arm's length." In *Resolution Trust Corp. v. District of Columbia*, 78 F.3d 606, 609 (D.C.Cir.1996), the District of Columbia Circuit Court of Appeals held that the plaintiff had not proven that its reliance was justified. The case involved termination of a lease agreement, and the court relied heavily on the standard of justified reliance set forth in the Restatement of *Contracts*. Nowhere in either case is there any suggestion that a plaintiff bringing a fraud claim in a non-contract case needs to plead that his reliance was justified.

█ Defendants also argue that Plaintiffs have failed to plead the elements of fraud with sufficient particularity, as required by Fed.R.Civ.P. 9(b). When alleging that a defendant has made misrepresentations, a plaintiff must plead with particularity the time, place, and content of the misrepresentations, the parties who relied on those misrepresentations, how they were relied on, and what injury re-

sulted from that reliance. *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1278 (D.C.Cir.1994). While Plaintiffs are correct that they have sufficiently pled the time, place, and content of those misrepresentations, they have not sufficiently pled reliance. Plaintiffs' pleading of reliance is, in stark contrast to the details given about Defendants' misrepresentations, quite general and abstract. More is needed for their fraud claim to survive. Consequently, Plaintiffs' fraud claim fails to state a claim. Plaintiffs shall have until January 25, 2000, to amend their complaints to correct this deficiency.

### 4. Special Duty Claims

Defendants argue that Plaintiffs' claims for negligent and intentional breach of special duty should be dismissed for two reasons. First, Plaintiffs have not alleged physical harm. Second, a special duty cannot arise from general corporate statements made in advertisements to the general public.

The Restatement (Second) of Torts §§ 323, 324A (1965)(emphasis added) sets forth the requirements for the torts of negligent and intentional breach of a special duty:

> § 323. Negligent Performance of Undertaking to Render Services
>
> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for *physical harm* resulting from his failure to exercise reasonable care to perform his undertaking, if

> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.
>
> . . . . .
>
> § 324A. Liability to Third Person for Negligent Performance of Undertaking
>
> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for *physical harm* resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

The Restatement defines "physical harm" as "the physical impairment of the human body, or of land or chattels." Restatement (Second) of Torts § 7(3) (1965).

Although the local District of Columbia courts have not formally adopted the Restatement, these two provisions have been cited with approval by both the D.C. Court of Appeals and the D.C. Circuit Court of Appeals. *Haynesworth v. D.H. Stevens Co.*, 645 A.2d 1095, 1097 (D.C.1994); *Long v. District of Columbia*, 820 F.2d 409, 419 (D.C.Cir.1987). Consequently, since Plaintiffs have not alleged any physical harm, as defined by the Restatement, they cannot recover on their special duty claims.[36]

---

**36.** Plaintiffs argue that the special duty torts have been extended to encompass economic harm. Plaintiffs cite two cases: *W.C. & A.N. Miller Cos. v. United States*, 963 F.Supp. 1231, 1243 (D.D.C.1997)(found that Army had special duty to warn landowner, as a subsequent occupant of property, that Army buried munitions on property during World War I), *aff'd sub nom. Hicks v. United States*, 1999 WL 414253 (D.C.Cir.1999); and *Federal Ins. Co. v. Thomas W. Perry, Inc.*, 634 F.Supp. 349, 353 (D.D.C.1986)(found special duty where defendant agreed to attempt to restart homeowner's oil-fired hot water furnace in subfreezing January weather but failed to do so). Both these cases, however, involved harm to land, which is encompassed under the Restatement's definition of "physical harm".

Defendants also argue that a special duty cannot be premised on general corporate statements or advertisements aimed at the general public. In response, Plaintiffs point to the "Frank Statement," where Defendants acknowledged and accepted their responsibility to safeguard the public health.

■ For a special duty to exist, the acknowledgment of that duty must have been made directly to the beneficiary, not to the general public through advertisements. "Converting a company's marketing into a special undertaking to inform the public about the known risks of its products would subject every manufacturer that advertises its products to liability for a 'special duty' created by such marketing, and that duty would be violated by every material omission in such advertising." *Steamfitters Local Union*, 171 F.3d at 936.

Because Plaintiffs have failed to allege any physical harm, and because a special duty cannot be created by corporate advertisements to the general public, Plaintiffs have failed to state a claim for negligent or intentional breach of a special duty or undertaking.

### 5. Indemnity Claim

"Indemnity may arise either in contract or in tort: by an express or an implied contract to indemnify; or by equitable concepts based on the tort theory of indemnity, for example, when one party has been only 'technically' or constructively at fault and the indemnitee has been actively at fault." *District of Columbia v. Murtaugh*, 728 A.2d 1237, 1245 (D.C.1999)(quoting *General Elec. Co. v. Cuban Am. Nickel Co.*, 396 F.2d 89, 90 (5th Cir.1968)).

Defendants argue that there is no relationship, in contract or otherwise, between the Defendants and Plaintiffs that requires them to indemnify the Plaintiffs. Defendants further argue that they have no duty to pay the medical expenses of the Funds' participants, and therefore no duty to indemnify can be implied.

Plaintiffs do not allege that there is an explicit or implied contractual relationship between the Funds and the Defendants. Plaintiffs base their allegations of entitlement to indemnification solely on the tort theory of indemnity. Plaintiffs argue that because they discharged a duty owed by Defendants, they have stated a cause of action for indemnification.

■ Plaintiffs, however, make two errors. First, the only duty argued to be owed by Defendants is the duty to pay for Fund participants' medical costs due to smoking. But Plaintiffs are putting the cart before the horse; without an initial determination by a court that Defendants are in fact liable for those expenses, Plaintiffs cannot be said to have discharged any duty by paying those expenses.

■ Second, under the theory of "'equitable' indemnity, the obligation is based on variations in the relative degree of fault of joint tortfeasors, and the assumption that when the parties are not *in pari delicto*, the traditional view that no wrongdoer may recover from another may compel inequitable and harsh results." *Murtaugh*, 728 A.2d at 1246 (quoting *East Penn Mfg. Co. v. Pineda*, 578 A.2d 1113, 1127 n. 20 (D.C.1990)). This is not the situation here. Plaintiffs do not allege they are joint tortfeasors with Defendants. Plaintiffs' claim is simply an unjust enrichment claim dressed in indemnity clothing, and thus must fail.

### 6. Unjust Enrichment Claim

■ To state a claim for unjust enrichment, Plaintiffs must establish that: (1) they conferred a legally cognizable benefit upon Defendants; (2) Defendants possessed an appreciation or knowledge of the benefit; and (3) Defendants accepted or retained the benefit under inequitable circumstances. *International Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. (Airline Div.) v. Association of Flight Attendants, AFL–CIO*, 864 F.2d 173, 177 (D.C.Cir.1988); *United States v.*

*Bouchey,* 860 F.Supp. 890, 894 (D.D.C. 1994). Defendants argue that Plaintiffs have failed to show any of these elements.

■ As to the first element, Plaintiffs argue that they have enriched Defendants by paying the increased medical costs attributable to Defendants' fraudulent conduct. Plaintiffs again put the cart before the horse; they fail to explain where Defendants' duty to pay these medical costs arose, and fail to show that this "duty" is legally cognizable. Plaintiffs also fail to fully explain exactly how Defendants "accepted or retained" the benefit under inequitable circumstances. Since Plaintiffs have failed to establish the first and third elements of their unjust enrichment claim, this claim too must fail.

### 7. Joinder

Under Fed.R.Civ.P. 19(a)(2)(ii),

A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if ... (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may ... (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

The intent of Rule 19 is to protect four interests: first, the plaintiff's interest in having a forum; second, the defendant's interest in avoiding multiple or inconsistent obligations; third, the "interest of the outsider whom it would have been desirable to join"; and fourth, the "interest of the courts and the public in complete, consistent, and efficient settlement of controversies." *Provident Tradesmens Bank &*

*Trust Co. v. Patterson,* 390 U.S. 102, 109–11, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968).

Defendants argue that the second, third, and fourth interests all weigh heavily in favor of dismissing these cases under Fed. R.Civ.P. 12(b)(7). Defendants argue that the following parties are necessary to this litigation: the Funds' participants, whose expenses are derivatively sought; any third-party health insurers with whom the Funds have contracted; and the employers who contributed to the Funds on behalf of the participants. Defendants argue that without those parties, there is great risk of multiple recoveries, inconsistent relief, and overlapping liability, and that the interests of the court and the public would be neglected.

■ The Funds' participants are not necessary parties because the only injuries the Funds allege are to the trust assets, separate from the personal injuries of their participants. The third-party health insurers have no claim for injuries suffered by the Funds, and any injuries they may have suffered are separate and distinct from those suffered by the Funds.[37] Consequently, they are also not necessary parties. Finally, the employers are not necessary parties because they are barred from claiming any right or interest in the trust assets.

Furthermore, as noted earlier, the single satisfaction rule would sufficiently protect Defendants from the dangers of duplicative recovery; to the extent that any other parties may claim or recover on injuries duplicative of those claimed by the Funds, Defendants could seek and receive credit for any amounts already paid.

Finally, Defendants argue that the failure to join these additional parties strips them of the affirmative defenses available to them under a typical personal injury

---

**37.** Indeed, many third-party health insurers have brought their own separate lawsuits. *See, e.g., Arkansas Blue Cross and Blue Shield v. Philip Morris, Inc.,* 47 F.Supp.2d 936 (N.D.Ill.1999); *Regence Blueshield v. Philip* *Morris, Inc.,* 40 F.Supp.2d 1179 (W.D.Wash. 1999); *Blue Cross and Blue Shield of N.J., Inc. v. Philip Morris, Inc.,* 36 F.Supp.2d 560 (E.D.N.Y.1999)

suit. Because this case is not one for recovery of personal injuries, but one for recovery of business or property damages under RICO, this argument is unpersuasive. Consequently, because Defendants have failed to show why any of the parties they name are necessary to this litigation, their motions to dismiss the complaints under Rule 12(b)(7) are denied.

### 8. Insufficiency of Process

In the second of these consolidated cases (Civil Action No. 98–1569), Plaintiffs failed to serve Defendants with the complaint until approximately six months after the complaint was filed, contrary to Fed. R.Civ.P. 4(m), which requires service to be completed within 120 days of the filing of the Complaint. Defendants argue that because Plaintiffs had not sought permission of the Court to depart from the Rule, and have failed to provide reasonable justification for failing to observe the Rule, this case should be dismissed. *Chung v. Lee*, 852 F.Supp. 43, 46 (D.D.C.1994)(must show good cause for violation of Rule 4(m) in order to avoid dismissal).

In response, Plaintiffs argue that their failure to comply with the Rule was due to excusable neglect and, because Defendants were not prejudiced and bad faith has not been alleged, judicial economy would best be served by enlarging the time within which they can serve Defendants.

Since the Court does not wish to prolong the resolution of this matter and waste resources by requiring Plaintiffs to re-file their case and start the entire process anew, the Court reluctantly accepts Plaintiffs' excuse of neglect and grants Plaintiffs, nunc pro tunc, until January 25, 1999, to serve Defendants. The Court admonishes Plaintiffs' counsel for this oversight, but has determined that the interest in a "just, speedy, and inexpensive determination" of this action will best be served by not burdening the parties and the Court with additional and unnecessary paperwork. Fed.R.Civ.P. 1.

### IV. Conclusion

For the reasons already discussed at substantial length, the Defendants' motions to dismiss for failure to state a claim [98–704: # 9; 98–1569: # 5; 98–1716 # 10] are denied as to the RICO claims, granted as to the fraud claim though Plaintiffs will be given until January 25, 2000, to correct the deficiency in their pleadings, and granted as to all other claims.

Additionally, Defendants have failed to show that Plaintiffs' failure to join various parties in this litigation would impede the disposition of the instant cases, or impair any party's interests. Consequently, Defendants motions to dismiss for failure to join necessary parties [98–704: # 10; 98–1716: # 11] are denied.

Finally, in the interests of justice and the expeditious handling of these cases, Defendants motion to dismiss Civil Action No. 98–1569 for Plaintiffs' failure to comply with Rule 4(m) [98–1569: # 7] shall be denied, and Plaintiffs will be given, nunc pro tunc, until January 25, 1999, to serve Defendants.

An Order will issue with this Opinion.

### *ORDER*

This matter[1] comes before the Court on certain Defendants' several motions to dismiss. Upon consideration of the motions, oppositions, replies, the applicable case law, the arguments presented at the oral hearing, and the entire record herein, for the reasons discussed in the accompanying Memorandum Opinion, it is hereby

**ORDERED,** that Defendants' motions to dismiss for failure to state a claim [98–704: # 9; 98–1569: # 5; 98–1716: # 10] are denied as to the RICO claims and granted as to all other claims; it is further

---

1. The above-captioned cases were consolidated for pre-trial purposes, without objection, by the Court's Order of June 10, 1999.

ORDERED, that Plaintiffs shall have until January 25, 2000 by which to amend their complaints to correct the deficiency in their pleading of their fraud claim; it is further

ORDERED, that Defendants' motions to dismiss for failure to join necessary parties [98–704: # 10; 98–1716: # 11] are denied; it is further

ORDERED, that Defendants' Motion to Dismiss for Insufficiency of Service of Process [98–1569: # 7] is denied, and the Plaintiffs in Civil Action No. 98–1569 shall be given, nunc pro tunc, until January 25, 1999, to serve Defendants; it is further

ORDERED, that Defendant B.A.T. Industries, which wishes to raise questions of personal jurisdiction, shall have until February 25, 2000 [2] to file a responsive pleading to the Plaintiffs' amended complaints.

---

**2.** Because the Court is granting Plaintiffs an opportunity to further amend their complaints, B.A.T. Industries shall have 30 days from the filing of those amended complaints to file a responsive pleading, rather than 30 days from the disposition of these motions, as provided in the Stipulated Order of July 9, 1999.